**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| GIRARD STREET INVESTMENT HOLDINGS LLC, | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| | : Case No. 24-cv-4448 |
| v. | : |
| | : |
| PDV HOLDING, INC., | : |
| | : |
| Defendant. | : |
| | : |

---

## COMPLAINT

Plaintiff Girard Street Investment Holdings LLC ("**Plaintiff**" or "**Girard Street**"), by and through its undersigned counsel, for its Complaint against Defendant PDV Holding, Inc. ("**PDVH**") alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for a turnover order and to pierce the corporate veil.  Plaintiff has a default judgment against Petróleos de Venezuela, S.A. ("**PDVSA**"), the alter ego and immediate parent of PDVH.

2.      PDVSA breached the terms of a note agreement when it failed to pay the required principal and interest on a promissory note, and now owes Plaintiff over $340 million, which continues to accrue interest at the contractually agreed-to, post-judgment rate of 8.5%.

3.      PDVH holds 100% of the shares in Citgo Holding, Inc. ("**Citgo Holding**"), which in turn owns 100% of Citgo Petroleum Corporation ("**Citgo**"), each of which has its principal place of business in Houston, Texas.

4. At all relevant times, PDVH has been an alter ego of PDVSA. Among other factors, PDVSA exercised significant and extensive economic control over PDVH, using PDVH's property as its own and commingling PDVSA's and PDVH's funds. PDVSA caused PDVH to transfer billions of dollars of Citgo dividends to PDVSA, leaving PDVH undercapitalized and unable to make its own dividend payments. Indeed, at the direction of PDVSA, the profits of PDVH have been used for the benefit of the sovereign functions of the Bolivarian Republic of Venezuela ("**Venezuela**" or the "**Republic**") and not for commercial purposes. In the fall of 2016, for example, PDVH pledged 100% of its equity in Citgo Holding in two transactions, for the benefit of PDVSA and without receiving consideration. PDVSA ignored PDVH's ordinary corporate formalities; exercised close political control over PDVH, managing PDVH and having a hand in its daily affairs; and issued policies or directives that caused PDVH to act directly on PDVSA's behalf, so that PDVSA was the real beneficiary of PDVH's conduct. Moreover, PDVH's officers and directors were nonfunctioning because they were appointed by PDVSA and there was overlap between the boards. PDVH's corporation is a façade for PDVSA's dominance, an abuse of the corporate form that perpetrates a wrong or injustice. Adherence to separate identities between PDVSA and PDVH would entitle PDVSA, as the agency and instrumentality of a foreign state, to benefits in United States courts while avoiding its obligations. No other remedies are practically available to Plaintiff at law or in equity to recover the debt owed to it by PDVSA other than to enforce its judgment against PDVSA's alter ego, PDVH.

5. As such, Plaintiff seeks a declaration that PDVH is the alter ego of PDVSA and is jointly and severally liable for the judgment entered against PDVSA. A turnover order requiring PDVH, an alter ego of the judgment-debtor, to bring its assets within the jurisdiction of this Court so that a writ of execution may issue against those assets is appropriate, and would prevent the

inequitable result that would otherwise occur if PDVSA were permitted to hide behind the corporate form it has abused.

## THE PARTIES

6.      Plaintiff Girard Street Investment Holdings LLC is a Limited Liability Company incorporated under the laws of the Cayman Islands, with its principal place of business in Connecticut.  The sole member of Girard Street is Gramercy Venezuela Opportunity Fund II, an Exempted Company incorporated under the laws of the Cayman Islands, with its principal place of business in Connecticut.

7.      Defendant PDV Holding, Inc. is a Delaware corporation with its principal place of business located at 1293 Eldridge Parkway, Houston, TX 77077.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens of a different State or a foreign State.

9.      PDVSA explicitly consented to submit to the "exclusive jurisdiction of any New York State court or federal court of the United States of competent jurisdiction sitting in the County of New York, State of New York, and any appellate court from any thereof" in any action or proceeding arising out of or relating to the Note Agreement, or the Note issued pursuant to the Note Agreement, by holders of the Note issued thereunder.  *See* Note Agreement Section 9.15(a), as defined below.

10.      The waivers, consents, agreements, and designations of a sovereign entity may be imputed to its alter egos, including waivers of sovereign immunity and consents to jurisdiction and venue in the Southern District of New York.  PDVSA's waiver and consent are therefore imputed

to its alter ego PDVH, and jurisdiction is proper in this Court.

11.     Even without applying the consent to jurisdiction that PDVH's alter ego, PDVSA, agreed to, personal jurisdiction over PDVH is also proper.  PDVSA has declared to the United States District Court for the Southern District of New York that "PDVSA's only U.S. asset is PDV Holding."  *Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A. at al.*, Case No. 1:19-cv-10023 (S.D.N.Y.), Dkt. 166 ¶ 19 ("**PDVH Statement of Facts**").

12.     PDVH has affirmatively sought the aid of the United States District Court for the Southern District of New York to protect its property rights in Citgo Holding in *Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A. at al.*, Case No. 1:19-cv-10023 (S.D.N.Y.), and has therefore purposefully invoked the benefits and protections of New York law.  PDVH admitted in that case that its Board of Directors, which had substantial overlap with PDVSA's Board of Directors, authorized the pledge agreement securing with 50.1% of the equity in Citgo Holding—which collateral is held in a vault in New York—the exchange of one set of notes, physically held in New York and governed by New York law, with another set of notes physically held in New York and governed by New York law (although it disputed the validity and legality of the pledge and new notes).  *See* PDVH Statement of Facts ¶¶ 46–48, 51, 176, 178–194.

13.     Venue is proper in this District pursuant to the express agreement of PDVH's alter ego PDVSA.   PDVSA "irrevocably and unconditionally" submitted to the "exclusive jurisdiction of any New York State court or federal court of the United States of competent jurisdiction sitting in the County of New York, State of New York, and any appellate court from any thereof" in any action or proceeding arising out of or relating to the Note Agreement or the Notes and waived any and all defenses as to venue, as well as to an inconvenient forum, and its waivers and consents are imputed to its alter ego PDVH.  *See* Note Agreement Sections 9.15(a)–

(b).

14.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because the Note Agreement, Note, and Assignment and Acceptances are all governed by New York Law and because the money judgment against PDVSA which is the subject of this turnover order was issued by the United States District Court for the Southern District of New York.

## FACTUAL ALLEGATIONS

I.     **Venezuela's Control of PDVSA, PDVH, and Citgo**

    *A.     Economic and Political Environment*

15.     On January 1, 1976, Venezuela created PDVSA as part of the nationalization of Venezuela's oil resources. Between 1986 and 1990, PDVSA acquired 100% ownership of Citgo.

16.     Beginning in approximately 2007, Hugo Chavez, the then-President of Venezuela, began a wave of nationalizations, including of large oil and mining projects, among many other expropriations.  Many of the entities whose assets had been nationalized initiated arbitration proceedings seeking compensation for the value of their expropriated property.

17.     Chavez used PDVSA as a "piggy bank" for Venezuela, as discussed in more detail below.

18.     Between 2007 and 2016, each of Moody's, Fitch, and S&P downgraded PDVSA's credit rating.  PDVH Statement of Facts ¶ 54.

19.     In June 2013, the United States recognized Nicolás Maduro as the President of Venezuela.

20.     In December 2015 elections for Venezuela's National Assembly, the opposition coalition won approximately two thirds—over 100—of the seats.  PDVH Statement of Facts ¶ 72.

21.     By June 2016, when the Note that forms the basis of the claim for which Plaintiff received a default judgment was issued, not only did PDVSA and Venezuela lack the funds to pay the accounts receivable owed to the noteholder, they also faced other substantial debts, including, but not limited to, various arbitral awards that had already been issued against PDVSA and Venezuela.

22.     In 2018, presidential elections were held in Venezuela.  Maduro claimed victory, but the National Assembly declared on January 15, 2019 that the election was illegitimate and named Juan Guaidó as the Interim President of Venezuela.

23.     The United States recognized Guaidó as the Interim President of Venezuela on January 23, 2019.

24.     On February 13, 2019, the National Assembly approved the Guaidó administration's appointments to the PDVSA Ad Hoc Board, which in turn appointed the directors of PDVH.  PDVH Statement of Facts ¶ 309.  In 2020, PDVSA and PDVH advised the United States District Court for the Southern District of New York that PDVSA's "board members [are] appointed by the Venezuelan government."  PDVH Statement of Facts ¶ 9.

25.     The Second Circuit noted in 2022 that control of PDVSA is divided: "The Maduro-appointed Board remained in control of all operations and assets in Venezuela. At the same time, … the Guaidó-appointed Ad Hoc Board was recognized in the United States as the governing body."  *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 463 (2d Cir. 2022).

26.     PDVH has been registered with the United States Department of Justice as a foreign agent for the PDVSA Ad Hoc Board since its creation.  In regular filings provided to the Department of Justice pursuant to the Foreign Agents Registration Act of 1938 ("**FARA**"), PDVH

explained that it "interacted with U.S. Government officials to advocate for a resolution to various creditor claims against the Government of Venezuela and/or its subsidiaries in which PDVH is either a party or in which the value of PDVH and its subsidiaries is implicated by the claim. PDVH's preparation for those meetings on occasion involved discussion with Venezuelan government officials within the Government of Juan Gerardo Guaidó." *See, e.g.*, September 30, 2022 Supplemental Statement Pursuant to the Foreign Agents Registration Act of 1938, as amended; March 30, 2023 Supplemental Statement Pursuant to the Foreign Agents Registration Act of 1938, as amended; May 16, 2023 Amendment to Registration Statement Pursuant to the Foreign Agents Registration Act of 1938, as amended; September 29, 2023 Supplemental Statement Pursuant to the Foreign Agents Registration Act of 1938, as amended; and March 28, 2024 Supplemental Statement Pursuant to the Foreign Agents Registration Act of 1938, as amended.

27.     In its September 2022 FARA filing, PDVH noted that Carlos Jordá, "[a]cting on behalf of PDVH, . . . ha[d] participated in meetings with representatives of the U.S. Government . . . to discuss the importance and means of protecting the assets of PDVH and its subsidiaries, or the value of said assets, from claims brought by creditors of the Maduro regime."

28.     Since January 2023, the United States has recognized the 2015 National Assembly as the legitimate governmental authority for the Bolivarian Republic of Venezuela.  The National Assembly currently supervises the Asset Protection Council, which in turn controls the PDVSA Ad Hoc Board.

29.     In its March 2023 FARA filing, PDVH reported that it had "participated in meetings with representatives of the U.S. Government and prepared materials for those meetings, in an effort to protect PDVH's assets from seizure or diminution in value by creditors of the

Maduro regime." PDVH also reported its "understand[ing] that under the DOJ's interpretation of FARA, PDVSA's indirect ownership of PDVH may, in itself, render PDVH an agent of the PDVSA Ad Hoc Board."

30. The Third Circuit determined in 2023 that PDVSA is the alter ego of Venezuela no matter when the inquiry is brought—that is, PDVSA under the control of the Maduro-appointed board is an alter ego of Venezuela, and PDVSA under the control of the PDVSA Ad Hoc Board is an alter ego of Venezuela.

31. As recently as March 28, 2024, PDVH reported in its FARA filing that "PDVH has worked to advocate for a resolution to various creditor claims against the Government of Venezuela and/or its subsidiaries in which PDVH is either a party or in which the value of PDVH and its subsidiaries is implicated by the claim."

32. At the time of filing of this complaint, 100% of the shares of Citgo are owned by Citgo Holding; 100% of the shares of Citgo Holding are owned by PDVH; and 100% of the shares of PDVH are owned by PDVSA (as controlled by the PDVSA Ad Hoc Board), which is an agency or instrumentality of Venezuela and is controlled by the Asset Protection Council, which in turn is controlled by the National Assembly.

### B. Dividend Payments

33. Chavez ordered Citgo to pay hundreds of millions of dollars in dividends to support the Venezuelan economy, as Dr. Juan Carlos Boué—an academic who conducted a study on PDVSA's internationalization program commissioned by PDV (UK) S.A. at the request of the Venezuelan Minister of Energy and Mines—noted in March 2004. ("The President gave orders that the affiliates (especially Citgo, by far the largest among them) should make a contribution to ameliorate the fiscal crisis in which the Venezuelan government found itself . . . As a result of this, Citgo declared 468 MMUSD in dividends for that year," some portion of which reached

PDVSA, "a figure which exceeded by 401 MMUSD the total amount of dividends that it had declared throughout the eight years in which PDVSA had been its sole shareholder.").

34.     In a May 25, 2005 speech to the Venezuelan National Assembly, Rafael Dario Ramírez Carroño, the Minister of Energy and Oil and President of PDVSA, explained that PDVSA was "putting an end to th[e] perverse structure" of the "iron 'Corporate Veil' that stood between international business and the control of the Venezuelan State."  He continued, "Our instructions to PDVSA to cooperate, without restriction, with [Venezuela's revenue service] the SENIAT, marks an attitude diametrically opposed to the attitude of the old PDVSA that allowed its activity to become a black box impenetrable to the control of the Venezuelan State. We are dismantling this black box, one by one in its parts, to definitively make the management of the new PDVSA transparent."  Mr. Ramírez concluded, "The reality is that PDVSA now belongs to the People, [and] is perfectly aligned with the guidance of the Venezuelan State . . . .  PDVSA and its workers are now an integral part of the country."

35.     The following year, in February 2006, Chavez instructed Mr. Ramírez "to allocate towards the financing of [a] Science Mission 941 billion bolivars derived from the dividends of PDVSA's subsidiary in the United States, CITGO, calculated at $500 million."  PDVSA's press release noted Chavez's "emphasi[s] that Citgo and all it has is 100% Venezuelan, when faced with some voices that have designated this company as American."

36.     Citgo's dividends continued to flow to PDVSA, through PDVH.  For example, in May 2013, Reuters reported that the "refining subsidiary of state-owned Petróleos de Venezuela (PDVSA) in the United States, Citgo, will pay $461 million in first-quarter dividends to the parent company this month," "a quarterly record."  In comparison, in the prior year, 2012, "all of PDVSA's external affiliates, including Citgo, reported a dividend to the parent company of just

$77 million."

37.    In July 2014, Citgo prepared to issue a $650 million note in part to finance $300 million in dividends for PDVSA.  Press coverage from July 17, 2014 noted Citgo would therefore "be indebted to provide resources to its parent company [PDVSA]."

38.    In February 2015, Citgo Holding issued $2.8 billion in debt, at PDVSA's direction, which largely passed through PDVH to PDVSA as a dividend.  Upon information and belief, this transaction was negotiated and orchestrated by PDVSA employees, not employees of PDVH or Citgo Holding.

39.    All of Citgo Holding's assets were pledged as collateral for the 2015 dividends.

40.    The transaction took place in two parts: Citgo Holding issued $1.5 billion in high-yield bonds, and Citgo Holding entered into a $1.3 billion loan facility.  Then Citgo Holding transferred the funds to PDVH as a dividend.  PDVH then declared a dividend and transferred the funds to PDVSA, which moved a significant portion of Citgo's value outside the United States—and the reach of creditors based in the United States, including the entities that had already been awarded billions of dollars in arbitration awards.

41.    This action was consistent with Venezuela's declared intent to refuse to pay arbitral awards.  *See* January 2012 speech by Chavez ("[W]e will not recognize any decision" by an arbitral panel.  "They are trying the impossible: to get us to pay them.  We are not going to pay them anything."); July 2014 statements by Venezuelan "energy ministry officials" that PDVSA was considering selling Citgo to "reduce the government´s exposure to foreign litigation," because of "concerns in Caracas" that arbitration awards totaling approximately $10 billion "could be followed by US court litigation resulting in attachments and liens on Citgo assets in the US."

42.    In August 2017, the United States issued an executive order explicitly prohibiting

"dividend payments or other distributions of profits to the Government of Venezuela from any entity owned or controlled, directly or indirectly, by the Government of Venezuela," an order which would prevent another such dividend transaction.  Executive Order 13808 of August 24, 2017, § 1(iv).

43.      This executive order followed a July 2017 press release by the United States Department of the Treasury Office of Foreign Asset Controls ("**OFAC**") announcing sanctions against certain Venezuelan officials and noting allegations that between 2004 and 2014, approximately $11 billion went missing from PDVSA.

44.      On August 1, 2019, after the PDVSA Ad Hoc Board took control, Citgo Holding was directed to issue $1.37 billion in 2024 notes secured by 100% of Citgo Holding's interest in Citgo, guaranteed by other subsidiaries, in a transaction governed by New York law.  PDVH Statement of Facts ¶ 475.  As discussed above, Citgo Holding is 100% owned by PDVH.

45.      In 2019, industry press for the oil and gas industry noted that Citgo's dividends had contributed significantly to PDVSA and Venezuela.  In 2019, Carlos Jorda, the President of Citgo, and Luisa Palacios, President of Citgo's Board of Directors and member of PDVH's Board of Directors, stated in an interview that Citgo's dividends were used to pay Venezuela's debts.

46.      In 2022, Horacio Medina, the President of the PDVSA Ad Hoc Board, noted that PDVH will not have assets for dividends until obligations to creditors have been paid off; the same year, Maduro stated that "PDVSA owns CITGO and its dividends belong to our country."

### C.      *Promissory Notes and the 2020 Bonds*

47.      In April 2007, PDVSA issued $3,000,000,000 in aggregate principal amount of notes due in April 2017 (the "**April 2017 Notes**"), and in October 2010 and January 2011, PDVSA issued $6,150,000,000 in aggregate principal amount of notes due in November 2017 (the "**November 2017 Notes**"). The principal on the November 2017 Notes was due in three equal

installments of $2,050,000,000 due on November 2, 2015; November 2, 2016; and November 2, 2017.  PDVH Statement of Facts ¶¶ 40–42.

48.     The April 2017 Notes and the November 2017 Notes (collectively the "**2017 Notes**") were denominated in U.S. dollars and governed by New York Law and New York forum-selection clauses, and the November 2017 Notes were deposited in New York, New York.  PDVH Statement of Facts ¶¶ 46–48, 51.

49.     In June of 2016, PDVSA was facing the prospect of many more arbitration awards, as well as principal payments of $2 billion in November 2016, $3 billion in April 2017, and $2 billion in November 2017.  Having made billions of dollars in dividend payments the previous year, PDVSA lacked the cash to manage its business in the ordinary course, and funded infrastructure projects through promissory notes, including but not limited to the Note at issue here.

50.     On September 16, 2016, an Exchange Offer was announced for the 2017 Notes, which had a collective outstanding principal balance of $7.1 billion.  PDVH Statement of Facts ¶ 64.

51.     On October 28, 2016 the Exchange Offer closed and the 2017 Notes were exchanged for 2020 bonds secured by a pledge of 50.1% of PDVH's equity in Citgo Holding.  The validity of the exchange and pledge is the subject of ongoing litigation PDVH and PDVSA initiated in the United States District Court for the Southern District of New York in 2019.

52.     A physical stock certificate for the collateral—50.1% of PDVH's equity in Citgo Holding—is held in a vault in New York.  PDVH Statement of Facts ¶ 176.

53.     On November 30, 2016, the remaining 49.9% of PDVH's equity in Citgo Holding was pledged as collateral in exchange for a $1.5 billion loan from Rosneft, an oil company

controlled by the Russian government.

54.    Over the span of a month, all of PDVH's assets were pledged.

55.    Yet PDVH did not receive value from either transaction.  The Venezuelan Special Attorney General, José Ignacio Hernández G., confirmed in 2019 that "PDV Holding, Inc. had no plausible financial reasons to establish the pledge in order to guarantee an obligation of its shareholder, unrelated to its line of business," and noted that "despite the fact that PDV Holding, Inc. signed the guarantee contract [the Pledge], in truth, it was PDVSA who undertook the obligation to establish that guarantee, for the benefit of its own public credit operation – which in no way benefitted PDV Holding, Inc."  PDVH Statement of Facts ¶ 327.

**D.    The Extent of Venezuela's Control Over PDVSA and PDVH**

56.    As discussed above, for decades Venezuela has considered Citgo, PDVH, and PDVSA to be "an instrument of [the Venezuelan] people," after "dismantling" the "perverse structure" of the "iron 'Corporate Veil' that stood between international business and the control of the Venezuelan State" to create the "reality . . . that PDVSA now belongs to the People, [and] is perfectly aligned with the guidance of the Venezuelan State."  Venezuela "emphasized that Citgo and all it has is 100% Venezuelan, when faced with some voices that have designated this company as American."

57.    PDVSA's articles of incorporation provide that PDVSA is a "state-owned company . . . under the form of a corporation, which will carry out and execute the policy issued in matters of hydrocarbons by the National Executive Branch."  Article 1, PDVSA Articles of Incorporation.  PDVSA's "company purpose [is] to plan, coordinate and supervise the actions of the companies it owns . . . in order to achieve an appropriate relationship between the hydrocarbon resources and the national economy, . . . and in general, to perform all those operations, contracts and commercial acts that are necessary or convenient for complying with the aforementioned

object." Title I, Article Two, PDVSA Articles of Incorporation.  Venezuela exerts de jure control over PDVSA.

58.     Furthermore, Venezuelan courts have recognized that "although Petróleos de Venezuela S.A. is a company incorporated and organized in the form of a corporation, it is beyond doubt, and this is reaffirmed by the Constitution of the Bolivarian Republic of Venezuela, that it is framed within the general structure of the National Public Administration, . . . because of the unbreakable principle that the Venezuelan State reserves the exclusivity of oil activity[.]  [B]y reason of national economic, political and strategic sovereignty, the Venezuelan State will retain all [PDVSA's] actions." *See* Constitutional Chamber of the Supreme Tribunal of Justice, Decision No. 464 (Mar. 18, 2002).  Similarly, in 2007, the same court reversed and remanded a case to the lower court with instructions to extend the "privileges" of the Venezuelan state to PDVSA.  *See* Constitutional Chamber of the Supreme Tribunal of Justice, Decision No. 281 (Feb, 26, 2007).

59.     PDVSA has represented to the United States Securities and Exchange Commission that it is regulated and supervised by the National Executive of Venezuela.

60.     Furthermore, every contract—national or international—to which PDVSA or any of its subsidiaries (including PDVH, Citgo Holding, and Citgo) or joint companies is a party is subject to prior review, approval, and/or validation by the President of PDVSA. *See* Venezuelan Official Gazette 41.294, Resolution No. 164 (Dec. 6, 2017) (any lack of such prior review, approval, and/or validation affects the existence and/or validity of the contract).  The President of PDVSA is a Venezuelan government official.

61.     In April 2018, Maduro issued Decree No. 44, which empowered the Venezuelan Minister of Petroleum to take a variety of actions to control PDVSA and its subsidiaries—including PDVH, Citgo Holding, and Citgo—such as creating, eliminating, or making changes to

PDVSA and its affiliates; creating, eliminating, modifying, or centralizing the management and administration of PDVSA and its affiliates; and ordering the amendment of the by-laws of state-owned oil companies.  *See* Venezuelan Official Gazette 440.859, Decree No. 44 (Apr. 12, 2018).

62.     PDVSA's financial statements include details of PDVH's financial situation.

### E.     PDVH's Board of Directors Overlaps with, and Is Controlled by, PDVSA's Board of Directors

63.     For decades, there has been overlap between the Boards of Directors of PDVSA and PDVH.  PDVSA's board members are appointed by decree by the President of Venezuela, and upon information and belief PDVH Directors would list their address as PDVSA's headquarters in Venezuela.

64.     Upon information and belief, in the 1990s Luis Urdaneta was Executive Vice President of PDVSA and a Director of PDVH; Alonso Velasco was a Director of PDVH and a Director of PDVSA; and Theodore Helms was a Director of PDVH and the self-described New York-based financial representative for PDVSA.

65.     Upon information and belief, in the years between 2000 and 2004, Aires Barreto served as a Director of PDVH and a Director of PDVSA; Carlos Jorda, presently the CEO of Citgo, served as a Director of PDVH and held various positions at PDVSA; and Oswaldo Contreras, the CEO of Citgo from 2000 to 2003, also served as a Director of PDVH and held various positions at PDVSA.

66.     Upon information and belief, in early 2003 Déster Rodríguez served concurrently as a Director of PDVSA, a Director of Citgo, and a member of the board of PDVH; his tenure on the board of PDVSA lasted until late 2008.

67.     Similarly, upon information and belief, in early 2005 Eudomario Carruyo served concurrently as a Director of PDVSA, a Director of Citgo, and a member of the board of PDVH; his tenure on the board of PDVSA lasted until late 2008.

68.     Upon information and belief, in early 2005, Alejandro Granado served concurrently as Vice President of PDVSA, President of Citgo, and President of PDVH; his tenure on the board of PDVSA lasted until late 2008.

69.     Also in the 2003–2010 time period, upon information and belief, Ivan Hernandez was involved in the management of PDVSA and served as a Director of PDVH.

70.     Upon information and belief, Nelson Martinez served concurrently as a Director of PDVH and President of PDVSA; Luis Marin served as a Director of PDVSA, the head of Citgo, and a Director of PDVH; Feliz Rodriguez served as a Vice President of PDVSA and a Director of PDVH; and Asdrubal Chavez served as a Director of PDVH and held a variety of positions at PDVSA.

71.     Upon information and belief, Víctor Aular served as a Director of PDVH, a Director of Citgo, and from 2011–2014 an Internal Director of PDVSA.

72.     Upon information and belief, Orlando Enrique Chacín served as a Director of PDVH and a Director of Citgo.  From 2011–2017 he served as an Internal Director of PDVSA, and from 2015–2017 he was PDVSA's Vice President of Exploration and Production.  In October 2016, Mr. Chacín was one of only three members of the board of PDVH.  PDVH Statement of Facts ¶ 94.  Mr. Chacín is also a registered foreign agent of PDVSA in connection with his work with PDVH.

73.     Upon information and belief, Jesús Enrique Luongo served as a Director of PDVH and a Director of Citgo.  From 2011–2016 he served as an Internal Director of PDVSA, and from

2015–2017 he was PDVSA's Vice President of Refining, Trade, and Supply.  On October 28, 2016, Mr. Luongo signed the pledge agreement for 50.1% of PDVH's equity, as part of the Exchange Offer, on behalf of PDVH.  PDVH Statement of Facts ¶ 103.  On that date Mr. Luongo was simultaneously the President of PDVH (and one of only three board members) and the PDVSA Vice President of Refining, Trade and Supply.  PDVH Statement of Facts ¶¶ 94, 111.  Mr. Luongo is also a registered foreign agent of PDVSA in connection with his work with PDVH.

74.     Upon information and belief, Anton Rafael Castillo served as a Director of PDVH and, from 2014–2017, an Internal Director of PDVSA.  In October 2016, Mr. Castillo was one of only three members of the board of PDVH, while serving simultaneously as a Director of PDVSA.  PDVH Statement of Facts ¶ 94.

75.     Upon information and belief, Eulogio Del Pino Díaz was President of PDVSA from 2014–2017, and also served as Chairman of the Board and President of Citgo Holding.

76.     Also in the 2011–2019 time period, upon information and belief Asdrubal Chavez served as a Director of PDVH, held a variety of positions at PDVSA, and was appointed the President of Citgo directly by Maduro, who did not first propose him to the boards of PDVH or Citgo Holding or otherwise follow corporate formalities.

77.     Upon information and belief, when the PDVSA Ad Hoc Board appointed a new board of directors of PDVH, the overlap continued.  For example, Exeario Boscan served as a Director on the PDVSA Ad Hoc Board in 2021, and a Director of PDVH from 2022–2024; and Carlos Jorda, the present CEO of Citgo who served as a Director of PDVH and held various positions at PDVSA in the early 2000s, served as a Director of PDVH from 2023–2024.

78.     PDVH reported on its September 2022 FARA filing that Carlos Jorda had rendered services directly in furtherance of the interests of the PDVSA Ad Hoc Board.

II.   **PDVH's Alter Ego PDVSA Breached Its Obligation to Pay a Promissory Note Which Was Assigned to Plaintiff; the United States District Court for the Southern District of New York Subsequently Entered a Default Judgment in Favor of Plaintiff for Over $340 Million**

A.   *Plaintiff Owns a Promissory Note Issued by PDVSA*

79.   On June 29, 2016, PDVSA, as Issuer, and PDVSA Petróleo S.A. ("**Petróleo**," a corporation organized under the laws of the Bolivarian Republic of Venezuela that is owned directly by PDVSA and indirectly by the Republic), as Guarantor, entered into a Note Agreement with Servicios Halliburton de Venezuela, S.A. ("**SHVSA**") (the "**Note Agreement**").  Pursuant to the Note Agreement, PDVSA issued a Note to SHVSA designated as a "Series 2016E" Note and numbered R-1 with a principal value of $200,000,123.50 (the "**Note**").  The Note accrued interest at a rate of 6.5% per annum, with quarterly payments due beginning September 29, 2016 (for interest only) and September 29, 2017 (for interest and principal) and a maturity date of June 29, 2019.  *See* PDVH Statement of Facts ¶ 491.

80.   The effect of the Note Agreement was to exchange unpaid accounts receivable due to SHVSA for a Note in a principal amount equal to the aggregate unpaid balance of the receivables.  In other words, PDVSA could not fund its ordinary business operations with cashflow, especially after having made such large dividend payments in 2015, and therefore funded its operations with debt.

81.   Effective January 14, 2021, SHVSA assigned the Note to Plaintiff pursuant to the Assignment and Acceptance.  Plaintiff received an OFAC license for this transfer.  Pursuant to the Assignment and Acceptance, for the agreed consideration, SHVSA irrevocably sold and assigned to Plaintiff, and Plaintiff irrevocably purchased and assumed from SHVSA, "the interest in and to all of [SHVSA]'s rights and obligations under the Note Agreement . . . ."

82.     On January 14, 2021, Plaintiff served, and PDVSA received, a Notice of Assignment and Resignation of Administrative Agent in both English and Spanish.  In the Notice of Assignment and Resignation of Administrative Agent, Plaintiff, "as current Noteholder, provide[d] notice . . . of its request of the resignation of SHVSA in its position as Administrative Agent, and agree[d] to not appoint a successor Administrative Agent, whereby Girard Street Investment Holdings LLC [would] hereafter perform all duties of the Administrative Agent under the Note Agreement and/or under any other Finance Document, thus rendering the resignation of SHVSA effective immediately as of the [Effective d]ate . . ., and relieving, releasing and discharging SHVSA of all of its duties and obligations set forth in the Note Agreement."

83.     The Notice of Assignment and Resignation of Administrative Agent advised that "by notice dated December 4, 2019 and stamped received on December 4, 2019, SHVSA, in its capacity as Administrative Agent, notified and confirmed to the Issuer and the Guarantor that an Event of Default had occurred and was continuing.  As of the date hereof, such Event of Default has not been cured."

84.     Pursuant to Section 9.17 of the Note Agreement, Plaintiff Girard Street Investment Holdings LLC, which has agreed to perform all duties of the Administrative Agent under the Note Agreement and/or under any other Finance Document, consents to the initiation of this action.

85.     Pursuant to the Assignment and Acceptance, "[f]rom and after the Effective Date," "all payments in respect of the Assigned Interest (including payments of principal, interest and other amounts)" were required to be made "to the Assignor for amounts which have accrued up to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date."  Assignment and Acceptance Annex I, Section 2 (Payments).

86.     Pursuant to Article IX, Section 9.04(b) of the Note Agreement, an assignee has the rights and obligations of a Noteholder from and after the Effective Date specified in the Assignment and Acceptance.

### B.     *PDVSA Failed to Pay*

87.     The Note Agreement defined PDVSA's "payment date" as the date on which the principal and interest is due as set forth in the schedule of payments in Exhibit A to the Form of Note attached to the Note Agreement.  *See* Note Agreement Section 1.01 (definition of "Payment Date"); *id.* at Exhibit A.

88.     Based upon the specified repayment schedule, PDVSA was required to make quarterly interest-only payments for one year beginning on September 29, 2016, followed by quarterly payments of both interest and principal through June 29, 2019.  Note Agreement at Exhibit A.  Pursuant to Article VI, Section 6.01 of the Note Agreement, Petróleo "absolutely, irrevocably and unconditionally" guaranteed PDVSA's payment obligations under the Note Agreement "as primary obligor and not merely as surety."  Note Agreement Section 6.01.

89.     Under the Note Agreement, failure to make the required payments when due constitutes an Event of Default and permits the Noteholders to recover the entire unpaid balance of the Note, plus interest at a default rate of 8.5% per annum.  Note Agreement Article VII (Events of Default) and Section 2.04 (Default Interest).  In particular, Article VII(a) of the Note Agreement defines "Events of Default" to include "the failure to pay the principal of, or interest on any of the Notes, when such principal becomes due and payable, including at any of the Payment Dates, by acceleration or otherwise, and such failure continues for a period of ten (10) days after written notice thereof has been given to the Issuer."

90.     The parties agreed that the default rate of 8.5% per annum, rather than the federal post-judgment interest rate, would apply even after a judgment was issued:

[F]rom the date the applicable action has been taken by the Required Noteholders and for so long as such Event of Default is continuing or until the date the Required Noteholders agree otherwise, to the extent permitted by law, all amounts outstanding under this Agreement and the other Finance Documents shall bear interest (*after as well as before judgment*), payable on demand, based on and computed on the basis of actual number of days elapsed on a year of 365 days, at a rate per annum equal to eight and one-half percent (8.50% ).

Note Agreement Section 2.04 (emphasis added).

91.    PDVSA failed to make the required principal payment on December 29, 2017 and the required principal and interest payments on March 29, 2018, and Petróleo did not pay as Guarantor.  On April 17, 2018, SHVSA, the Noteholder and Administrative Agent at the time, delivered written notice to PDVSA that an Event of Default for non-payment of those three payments had occurred and was continuing, and reserving certain rights and remedies.

92.    PDVSA failed to make the required principal and interest payments on June 29, 2018, and Petróleo did not pay as Guarantor.  On August 6, 2018, SHVSA, the Noteholder and Administrative Agent at the time, delivered written notice to PDVSA that an Event of Default for non-payment of three principal payments and two interest payments had occurred and was continuing, and reserving certain rights and remedies.

93.    PDVSA failed to make the required principal and interest payments on September 29, 2018; December 29, 2018; and March 29, 2019, and Petróleo did not pay as Guarantor.  On May 14, 2019, SHVSA, the Noteholder and Administrative Agent at the time, delivered written notice to PDVSA that an Event of Default for non-payment of the principal and interest payments had occurred and was continuing, and reserving certain rights and remedies.

94.    PDVSA failed to make the final required principal and interest payments on June 29, 2019, and Petróleo did not pay as Guarantor.  On December 4, 2019, SHVSA, the Noteholder and Administrative Agent at the time, delivered written notice to PDVSA that an Event of Default

for non-payment of the December 2017; March 2018; June 2018; September 2018; December 2018; March 2019; and June 2019 principal payments, and the March 2018; June 2018; September 2018; December 2018; March 2019; and June 2019 interest payments, had occurred and was continuing, and reserving certain rights and remedies.

95.     Since December 2019, neither PDVSA nor Petróleo has made any additional payments on the outstanding amounts or raised any defenses to payment.

96.     PDVSA is contractually obligated to pay the amounts of interest and principal declared to be due and payable, together with accrued interest thereon, "without presentment, demand, protest or any other notice of any kind . . . ." Note Agreement Article VII.

97.     Petróleo, as Guarantor, contractually agreed that Plaintiff may recover under the Guarantee regardless of whether the obligations in the Note Agreement are invalid, illegal or unenforceable and waived "any defense based on or arising out of any defense of the Issuer or the Guarantor or the unenforceability of all or any part of the Guaranteed Obligations . . . ." Note Agreement Sections 6.03(b) and 6.04.  Petróleo further waived any right to "acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against any Obligated Party or any other person." Note Agreement Section 6.04.

### C.     *Plaintiff Received a Default Judgment in SDNY*

98.     On December 11, 2023 Plaintiff brought a claim against PDVSA and Petróleo in the United States District Court for the Southern District of New York for breach of contract, seeking to enforce the Note Agreement.

99.     On December 20, 2023 the summons and complaint were properly served on Corporation Service Company, PDVSA and Petróleo's registered agent in Albany, NY, pursuant to the terms of the Foreign Sovereign Immunities Act.

100.    Personal service on a legal representative of Corporation Service Company constituted proper service on PDVSA pursuant to 28 U.S.C. § 1608(b)(1) and (b)(2).  Pursuant to 28 U.S.C. § 1608(c)(2), service on PDVSA was therefore deemed to have been made as of December 20, 2023.

101.    As an agency or instrumentality of a foreign state served pursuant to 28 U.S.C. § 1608(b), PDVSA was required to serve an answer or other responsive pleading to the complaint within sixty days after service, so PDVSA's answer or other responsive pleading was due 60 days from December 20, 2023.  PDVSA was therefore required to answer or otherwise respond to the Complaint on or before February 20, 2024.

102.    Personal service on a legal representative of Corporation Service Company constituted proper service on Petróleo pursuant to Fed. R. Civ. P. 4(h)(1)(B), so Petróleo's answer or other responsive pleading was due 21 days from December 20, 2023. Petróleo was therefore required to answer or otherwise respond to the Complaint on or before January 10, 2024.

103.    Petróleo did not answer the complaint or file a responsive pleading by January 10, 2024, and PDVSA did not answer the complaint or file a responsive pleading by February 20, 2024.

104.    The United States District Court for the Southern District of New York (the Honorable Judge Rakoff) conducted a telephonic Status Conference on February 5, 2024 at which Plaintiff was directed to file a motion for default judgment.

105.    On February 22, 2024, Plaintiff filed a proposed certificate of default. The Clerk of Court issued the certificate of default on February 23, 2024.

106.    Plaintiff filed a motion for default judgment on February 23, 2024, and the United States District Court for the Southern District of New York heard the case on March 4, 2024.

107.    On March 5, 2024 the United States District Court for the Southern District of New York entered an order granting default judgment in favor of Plaintiff and against PDVSA and Petróleo.

108.    On March 8, 2024, the Court vacated the March 5 order and superseded it with an order granting default judgment in favor of Plaintiff and against PDVSA and Petróleo jointly and severally, in the amount of $175,000,108, plus interest from December 29, 2017 to the date of entry of judgment in the amount of $166,103,870, for a total of $341,103,978, plus attorneys' fees and costs in an amount that was to be determined.  *Girard Street Investment Holdings LLC v. PDVSA et al.*, Case No. 23-10772 (S.D.N.Y.), Dkt. 34 (the "**Default Judgment**").  The Default Judgment specified that all sums would continue to accrue interest post-judgment at the contractual post-judgment rate of 8.5%, which summed to $84,107.83 per day before any attorneys' fees or costs were determined.

109.    On March 25, 2024, the Court awarded Plaintiff $122,342.60 in attorneys' fees and costs, which sum now accrues interest at the rate of 8.5%.

## III.    PDVH Is an Alter Ego of PDVSA

110.    PDVH is a wholly-owned subsidiary, and alter ego, of PDVSA, which is a corporation organized under the laws of Venezuela and owned directly by Venezuela, which is a foreign state.  PDVSA is wholly owned by, and is an agency and instrumentality of, Venezuela, and it is Venezuela's alter ego.  *See OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 172 (3d Cir. 2023) ("[I]t is clear PDVSA is Venezuela's alter ego."); 28 U.S.C. § 1603(b).

111.    At all relevant times, PDVSA dominated and controlled PDVH for its own benefit and ultimately the political and social benefit of the government of Venezuela, and used such

domination to commit a wrong against Plaintiff, which resulted in Plaintiff's injury.

**A.    Under the Bancec Standard, PDVH Is an Alter Ego of PDVSA**

112.    PDVSA, and through PDVSA the Republic, exerts significant and extensive economic control over PDVH.  As discussed above, the PDVSA Board overlaps with, and controls, PDVH's Board; Venezuelan and PDVSA authorities have issued public statements regarding the lack of a corporate veil between Citgo, Citgo Holding, PDVH, PDVSA, and Venezuela; PDVH has issued dividends for the benefit of PDVSA and Venezuela; Venezuelan governmental officials have the authority to review PDVH's transactions; and PDVH pledged 50.1% of its assets with no value received, for the benefit of PDVSA.

113.    PDVSA uses PDVH's property as its own and ignores any commercial purpose for such assets.  As discussed above, and confirmed by public statements from Venezuela and PDVSA, all of PDVH's profits are directed by PDVSA away from PDVH and to PDVSA, not for commercial purposes, but for the political and social uses of PDVSA and the Republic.

114.    PDVSA ignores PDVH's ordinary corporate formalities and exercises close political control over PDVH, managing PDVH and having a hand in its daily affairs.  Upon information and belief, some of the corporate records and/or corporate formalities relating to corporate records are incomplete.

115.    PDVH's ordinary business decisions, such as its contracts, must be approved by the President of PDVSA, a Venezuelan political actor.  For example, as discussed above, the PDVSA Board overlaps with, and controls, PDVH's Board; Venezuelan and PDVSA authorities have issued public statements regarding the deliberate lack of a corporate veil between Citgo, Citgo Holding, PDVH, PDVSA, and Venezuela; PDVH has issued dividends for the benefit of PDVSA; and PDVH pledged 50.1% of its assets with no value received, for the benefit of PDVSA.

116.     As discussed above, for decades there has been overlap between the Boards of Directors of PDVSA and PDVH.  PDVSA has used its influence over PDVH's Directors to interfere with PDVH's ordinary business affairs, such as when concurrent Directors of PDVSA and PDVH caused PDVH to pledge 50.1% of its assets to secure PDVSA's promissory note issuance, without receiving any value in exchange, in October 2016.

117.     PDVSA issues policies or directives that cause PDVH to act directly on its behalf, so that PDVSA is the real beneficiary of PDVH's conduct.  For example, as discussed above, Venezuelan and PDVSA authorities have issued public statements regarding the deliberate lack of a corporate veil between Citgo, Citgo Holding, PDVH, PDVSA, and Venezuela, and the use of Citgo's resources for the benefit of Venezuela; PDVH has issued dividends for the benefit of PDVSA; PDVH pledged 50.1% of its assets with no value received, for the benefit of PDVSA; and PDVH is registered with the Department of Justice as a foreign agent acting on behalf of the PDVSA Ad Hoc Board.

118.     Finally, adherence to separate identities between PDVSA and PDVH would entitle PDVSA, as the agency and instrumentality of a foreign state, to benefits in United States courts while avoiding its obligations.  PDVH has used *the United States District Court for the Southern District of New York* to seek the invalidation of other creditors' claims against the very assets which Plaintiff now seeks to have turned over.

**B.     Under Delaware Law, PDVH Is an Alter Ego of PDVSA**

119.     In the alternative, where Delaware law determines whether to pierce the veil of a Delaware corporation, PDVH is, and has been at all relevant times, an alter ego of PDVSA.

120.     Delaware courts expressly permit creditors to impose liability on subsidiaries for the liabilities of the parent.

121.     At all relevant times, PDVSA and PDVH operated as one entity.

122.     PDVSA left PDVH undercapitalized by causing PDVH to transfer billions of dollars of Citgo dividends to PDVSA, which also commingled PDVSA's and PDVH's funds and allowed PDVSA to siphon PDVH's funds and left PDVH without the ability to distribute its own dividend payments.

123.     Together with the 2016 pledges of all of PDVH's assets (49.9% in October 2016 and 50.1% in November 2016), this was part of a strategic effort on the part of PDVSA and Venezuela to ensure that creditors of either PDVSA or Venezuela could not recover the money they were owed.

124.     PDVSA failed to observe corporate formalities when its President reviewed PDVH's contracts, as set forth in Resolution No. 164, and when Decree No. 44 authorized the Venezuelan Minister of Petroleum to make changes to PDVH and modify or centralize PDVH's management and administration.  Moreover, upon information and belief, some of the corporate records and/or corporate formalities are incomplete.

125.     Due to PDVSA causing PDVH to effectuate the 2015 dividend transactions, PDVH does not have the funds to pay dividends.  In 2022, Horacio Medina, the President of the PDVSA Ad Hoc Board, noted that PDVH does not have assets for dividends, and will not have them until obligations to creditors have been paid off.

126.     As discussed above, PDVH's officers and directors were nonfunctioning, because they were appointed by PDVSA and there was overlap between the boards, and PDVH's corporate existence is a façade for PDVSA's dominance.  Resolution No. 164 authorized the President of PDVSA to review PDVH contracts, and Decree No. 44 authorized the Venezuelan Minister of Petroleum to make changes to PDVH and modify or centralize PDVH's management and administration.  The 2015 dividend transaction, and the 2016 pledges of 100% of PDVH's assets

within a month, further illustrate that PDVH is a façade for PDVSA, as does PDVH's registration with the Department of Justice as a foreign agent of PDVSA.

127.    PDVSA abused the corporate form to perpetrate a wrong or injustice.

128.    Piercing the veil from PDVSA to PDVH would not impair the legitimate expectations of any adversely affected shareholders who are not responsible for the conduct that gave rise to the claim. PDVSA owns 100% of the shares of PDVH, so there are no shareholders who are not responsible for the conduct.

129.    Allowing the veil to be pierced from PDVSA to PDVH would not establish a precedent troubling to shareholders generally.

130.    Innocent third parties with claims on PDVH's assets will not be harmed if the Court pierces the veil between PDVSA and PDVH.  The only third parties with claims on PDVH's assets of whom Plaintiff is aware are those who hold the 2020 PDVSA bonds, whose alleged interests if proven would be senior and who are ably represented in the United States District Court for the Southern District of New York.

131.     PDVSA has exercised significant and extensive dominion and control over PDVH.

132.    As a creditor of PDVSA, Plaintiff is harmed by PDVSA's exercise of dominion and control over PDVH.

133.    The public convenience would be served by allowing the veil to be pierced from PDVSA to PDVH because New York's recognized interest as a national and international center of finance and commerce would be strengthened if purchasers of promissory notes gained confidence that the issuers of the notes could not render the commercial papers worthless by shifting their assets to a subsidiary and defaulting on the notes.

134.    The wrongful conduct engaged in by PDVSA is extensive and severe.

135.    Plaintiff comes before the Court with clean hands and has engaged in no wrongful conduct sufficient to bar it from obtaining equitable relief.  Plaintiff properly purchased a noteholder's rights in a promissory note through an assignment, and complied with all requirements for such an assignment as set forth in the terms of the note agreement governing the promissory notes.  Plaintiff then properly brought a breach of contract action in the court where all parties had consented to jurisdiction, established its right to relief by evidence satisfactory to the court, and obtained a default judgment.  Plaintiff seeks now to pierce the veil between PDVSA and PDVH in order to exercise the remedies available to it as a judgment creditor.

136.    No other remedies are practically available to Plaintiff at law or in equity to recover the debt owed to it by PDVSA.  Multiple judges have recognized the extent of PDVSA's recalcitrance as a judgment debtor, and vast judicial resources have been expended by creditors seeking to recover, both in law and in equity, the debts owed to them by PDVSA.  Upon information and belief, no creditors have recovered anything from PDVSA in years.

## CLAIM FOR RELIEF

### COUNT I

**Declaratory Relief Against PDVH**

137.    Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

138.    Plaintiff is a creditor of PDVSA pursuant to the Default Judgment.

139.    Pursuant to the *Bancec* test, PDVH is an alter ego of PDVSA, and PDVH is liable for the Default Judgment as an alter ego of PDVSA.

        a.   At all relevant times, PDVSA exercised significant and extensive economic

control over PDVH.

b.   At all relevant times, PDVSA used PDVH's property as its own, and PDVH's profits went to PDVSA.

c.   At all relevant times, PDVSA ignored PDVH's ordinary corporate formalities.

d.   At all relevant times, PDVSA exercised close political control over PDVH, managing PDVH and having a hand in its daily affairs.

e.   At all relevant times, PDVSA issued policies or directives that caused PDVH to act directly on PDVSA's behalf, so that PDVSA was the real beneficiary of PDVH's conduct.

f.   Adherence to separate identities between PDVSA and PDVH would entitle PDVSA, as the agency and instrumentality of a foreign state, to benefits in United States courts while avoiding its obligations.

140.   Pursuant to Delaware law, PDVH is an alter ego of PDVSA, and PDVH is liable for the Default Judgment as an alter ego of PDVSA.

a.   At all relevant times, PDVSA and PDVH operated as one entity.

b.   PDVSA left PDVH undercapitalized by causing PDVH to transfer billions of dollars of Citgo dividends to PDVSA, which also commingled PDVSA's and PDVH's funds and allowed PDVSA to siphon PDVH's funds and left PDVH without the ability to distribute its own dividend payments.  PDVSA failed to observe corporate formalities when the President of PDVSA reviewed PDVH's contracts.  PDVH's officers and directors were nonfunctioning, because they were appointed by PDVSA and there was overlap between the boards, and PDVH's corporation is a façade for PDVSA's dominance.

c.  At all relevant times, PDVSA abused the corporate form to perpetrate a wrong or injustice.

d.  Piercing the veil from PDVSA to PDVH would not impair the legitimate expectations of any adversely affected shareholders who are not responsible for the conduct that gave rise to the claim.

e.  Allowing the veil to be pierced from PDVSA to PDVH would not establish a precedent troubling to shareholders generally.

f.   At all relevant times, PDVSA exercised extensive dominion and control over PDVH, which harmed Plaintiff as a creditor of PDVSA.

g.  The public convenience would be well served by allowing the veil to be pierced from PDVSA to PDVH.

h.  At all relevant times, the wrongful conduct engaged in by PDVSA was extensive and severe.

i.   Plaintiff comes before the Court with clean hands and has engaged in no wrongful conduct sufficient to bar Plaintiff from obtaining equitable relief.

j.   Innocent third-party creditors of PDVH will not be harmed if the Court pierces the veil between PDVSA and PDVH.

k.  No other remedies are practically available to Plaintiff at law or in equity to recover the debt owed to it by PDVSA.

141.    An actual case or controversy exists, in that PDVH disputes that it is an alter ego of PDVSA and that it is liable for PDVSA's debt, whereas Plaintiff contends it is so liable.

142.    An inequitable and unjust result would follow if the corporate separateness of PDVH was respected as against Plaintiff and the Default Judgment owed to Plaintiff; no adequate

alternative remedy exists; and a declaration of the liability of PDVH, as the alter ego of PDVSA, is necessary to operate prospectively and to allow Plaintiff to recover the unpaid amount of the Default Judgment from PDVH.

143.    Plaintiff seeks a declaration of its right to recover the unpaid amount of the Default Judgment from PDVH as an alter ego of PDVSA with respect to Plaintiff and the Default Judgment.

144.    Such a judicial declaration is necessary and appropriate at this time and under the circumstances and to resolve the dispute between Plaintiff and PDVH.

145.    Accordingly, Plaintiff seeks a declaratory judgment pursuant to the Court's authority under 28 U.S.C. § 2201 finding PDVH, as an alter ego of PDVSA, liable to Plaintiff for the unpaid amount of the Default Judgment, along with interest, attorneys' fees, and costs.

## COUNT II

### Turnover Pursuant to CPLR 5225(b) and Fed. R. Civ. P. 69

146.    Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

147.    PDVH is an alter ego of PDVSA.

148.    PDVH is in possession or custody of money or other personal property, to wit, shares of Citgo Holding.

149.    To satisfy the Default Judgment, Plaintiff is entitled to possession of PDVH's shares of Citgo Holding, to the extent of the money damages awarded in the Default Judgment, plus interest thereon.

150.    To satisfy the Default Judgment, Plaintiff's interest in PDVH's shares of Citgo Holding, to the extent of the money damages awarded in the Default Judgment, plus interest thereon, is superior to the interest of PDVH in such funds, subject to any claims by third parties

with superior, prior claims.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendant, as follows:

i.        entering judgment in favor of Plaintiff and against Defendant;

ii.       declaring that PDVH is an alter ego of PDVSA and liable to Plaintiff for the unpaid amount of the Default Judgment;

iii.      awarding Plaintiff's requested relief against Defendant by issuing a Turnover Order to ensure PDVH's assets will be accessible to Plaintiff in the state of New York;

iv.      awarding Plaintiff reasonable attorneys' fees and costs incurred by Plaintiff in enforcing its rights and remedies in this action; and

v.       granting such other and further relief as this Court shall deem just and proper.

Dated: June 10, 2024
New York, NY

Respectfully,


By: /s/ *Evan Glassman*
    Evan Glassman
    STEPTOE LLP
    1114 Avenue of the Americas
    New York, NY 10036
    Tel: (212) 506-3900
    Fax: (212) 506-3950
    E-mail: eglassman@steptoe.com

    Michael J. Baratz
    (*pro hac vice* application forthcoming)
    Emma Marshak
    (*pro hac vice* application forthcoming)
    STEPTOE LLP
    1330 Connecticut Avenue, NW
    Washington, DC 20036
    Tel: (202) 429-3000
    Fax: (202) 429-3902
    E-mail: mbaratz@steptoe.com
    E-mail: emarshak@steptoe.com

    *Counsel for Plaintiff*
    *Girard Street Investment Holdings LLC*